UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LISA BAKER, | ) |
| JACQUELINE DOUGHERTY, | ) |
| KEYANNA JONES, | ) |
| AMELIA WELTNER | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF ATLANTA, | ) |
| STATE OF GEORGIA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## **VERIFIED COMPLAINT**

The Plaintiffs are residents of unincorporated DeKalb County, Georgia. All Plaintiffs live, or have lived, within four miles of the proposed Atlanta Public Safety Training Center, known to many as "Cop City." Each wants to support the current referendum initiative to repeal the City of Atlanta ordinance authorizing the lease and construction of the training center by circulating and collecting signatures on petitions of qualified residents of Atlanta. But Atlanta Municipal Code § 66-37(b), adopted under O.C.G.A. § 36-35-3(b)(2)(C), bars Plaintiffs from collecting those signatures because they are not current City of Atlanta residents.

This restriction violates the First Amendment rights of citizens to speech and petition their government, and Plaintiffs bring this lawsuit seeking declaratory and injunctive relief against the City of Atlanta Municipal Code § 66-37(b) and the petition forms promulgated thereunder. Moreover, as the existing petition process is unconstitutional because of Atlanta Municipal Code § 66-37(b), Plaintiffs seek to have the 60-day period in which to gather qualified signatures be re-started upon the date of this Court's order establishing a constitutional process for signature collection. O.C.G.A. § 36-35-3(b)(2)(C).

## PARTIES

1.  Plaintiffs Lisa Baker, Jacqueline Dougherty, Keyanna Jones, and Amelia Weltner are residents of unincorporated DeKalb County, Georgia.

2.  The City of Atlanta is a municipal corporation located in Georgia. Its City Council is tasked with determining the validity of the referendum petition.

3.  The State of Georgia's law granting home rule powers to municipal corporations contains the residency restriction that the City of Atlanta has enforced and incorporated into its own ordinance on referendums.  The State of Georgia is joined only for declaratory relief, if necessary, as to whether that portion of O.C.G.A. § 36-35-3(b)(2)(C) that requires that petition circulators be residents is constitutional.

2

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case presents a federal question.

5.      Upon service of process, this Court acquires personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(a).

6.      Venue is proper in the Atlanta Division of the Northern District of Georgia under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

*The Political Moment*

7.      A coalition of individuals and organizations filed a referendum petition with the Municipal Clerk of the City of Atlanta on June 7, 2023, seeking to repeal City of Atlanta Ordinance 21-O-0367.

8.      Ordinance 21-O-03067 authorized the lease of 265 acres of City property in unincorporated DeKalb County to the Atlanta Police Foundation for the purpose of building a $90 million public safety training center (hereinafter "Training Center").

9.      Since its inception, strong public opposition has called on the City Council to reject the construction and proposed location of the Training Center.

10.    In October 2021, City Council received 1,126 comments, approximately seventeen hours' worth of recordings, that they listened to over the course of two days. The public comments overwhelmingly opposed the lease.

11.    Despite the massive opposition to the project, City Council passed the ordinance by a vote of ten to four.

12.    The initial lease did not include the necessary public funding to complete construction.

13.    Instead, in May 2023, council members sought to introduce a funding bill that would authorize $33.5 million in city funds for the Training Center's construction.

14.    At that initial meeting on May 15, 2023, nearly three hundred people signed up for public comments. Every commenter testified against the Training Center.

15.    When the final vote on funding the Training Center took place on June 5, 2023, City Council received nearly fifteen hours of public comment against the construction and funding of the proposed Atlanta Public Safety Training Center. Only four public commenters of the more than 350 people who signed up gave comments in support of the Training Center.

16.    Despite repeated, record public opposition to the Training Center, Atlanta City Council approved funding of $33.5 million for the Training Center.

17.    Having exhausted all reasonable means of influencing the legislative process through public comment, the Cop City Vote coalition filed a referendum petition to empower Atlanta voters to decide the Training Center's fate.

*The Plaintiffs*

18.    Plaintiff Lisa Baker is a nurse who lives around four miles from the site of the Training Facility but is not a City of Atlanta resident.

19.    Ms. Baker has been organizing and involved in environmental justice movements in the Atlanta area since 2007, when she began a local chapter of Step It Up (now known as "350.org").

20.    She has been active in her opposition to the City Council's proposed Training Center since before 2021.

21.    She is involved in the Cop City Vote coalition and wants to be part of its volunteer corps that obtains signatures supporting the referendum.

22.    On June 21, 2023, Ms. Baker was among the first to volunteer to canvass signatures for the referendum petition.

23.    Because Atlanta Municipal Code § 66-37(b) requires each team of canvassers to have a current City of Atlanta resident, she had fewer teams of volunteers who could canvass than the total number of volunteers.

24.     She also wanted to volunteer for a second shift that day but did not have a City of Atlanta resident to accompany her, so she could not go out.

25.     Plaintiff Jacqueline Dougherty is an early childhood education instructor and is currently pursuing a Masters in art and education at Georgia State University. Ms. Dougherty lives less than two miles from the future site of the Training Center but is not a City of Atlanta resident.  She has been actively involved in issues concerning the land and watershed in and around Intrenchment Creek for eight years, which flows through the land where the Training Center will be built.

26.     Ms. Dougherty has enjoyed the forest and nearby parks recreationally. She has accompanied hydrologists studying the watershed. And in 2016 she participated in mapping its headwaters with the South River Watershed Alliance.

27.     She has participated in canvassing for political candidates in recent elections and was prepared to canvass once the Cop City Vote coalition filed its referendum petition.

28.     However, because of the residency restrictions of Atlanta Municipal Code § 66-37(b), Ms. Dougherty cannot collect signatures herself, despite the negative impacts the Training Facility will have on her use and enjoyment of the land near her home.

29.     Keyanna Jones and her family grew up in the neighborhood abutting the Training Center site but is not a City of Atlanta resident.

30.     In January 2022, she moved back to the neighborhood with her husband and children. In May 2023, she and her family decided they needed to move out of her neighborhood because of the effect the sounds of gunfire from the nearby police firing range on her son's well-being.

31.     Ms. Jones has worked for years as a community organizer and worked in other campaigns opposing the harmful effects of carceral facilities in and around Atlanta.

32.     Ms. Jones has actively participated in the Cop City Vote coalition. She has an active desire to circulate a referendum petition but cannot do so because she is not a City of Atlanta resident.

33.     Amelia Weltner lives in unincorporated DeKalb County in the East Atlanta Village neighborhood on the border with the City of Atlanta but is not a current City of Atlanta resident. She moved to the neighborhood after living in Old Fourth Ward in the City of Atlanta.

34.     Ms. Weltner's home is less than three miles from the proposed site of the Training Facility.

35.    Ms. Weltner is an active member of the East Atlanta Community Association, and in December 2022, she planned a canvass of neighborhoods in East Atlanta, collecting signatures for a petition to demonstrate public opposition to the Training Facility in the East Atlanta Village.

36.    Ms. Weltner has an active desire to circulate a referendum petition but cannot do so under Atlanta Municipal Code § 66-37(b) because – although living only feet away from the border of the City of Atlanta - she is not a City of Atlanta resident.

*The Residency Restrictions in Georgia Law*
*and City of Atlanta's Municipal Code*

37.    The Georgia Constitution authorizes the Legislature to establish the laws by which a municipality may exercise home rule. Ga. Const. art. IX, § 2, ¶ II.

38.    The Georgia Legislature then created a process by which citizens could petition for a referendum to "amen[d] or repeal[] ordinances, resolutions, or regulations" adopted by cities under the cities' home rule powers. O.C.G.A. § 36-35-3(b)(2)(A).

39.    Within that same statute, the Legislature specifies who may collect signatures for a referendum. O.C.G.A. § 36-35-3(b)(2)(C) requires:

> The clerk of the governing authority shall provide a place on each form for the person collecting signatures . . . to swear that he or she is a resident of the municipality affected by the petition and that the signatures were collected inside the boundaries of the affected municipality.

40.     The City of Atlanta's charter authorizes its City Council to "prescribe procedures to govern the initiation, adoption, and repeal of ordinances by the electorate." City of Atlanta Charter § 2-501(a).

41.     The City Council created a procedure that mirrors the residency restriction in Georgia's home rule law through Atlanta Municipal Code § 66-37(b) without ensuring that the First Amendment rights of petition circulators regardless of residency. The text of that subsection states:

> The sponsor of a petition authorized by this section shall obtain copies of all official petitions from the municipal clerk. The municipal clerk shall approve all petitions as to form. The municipal clerk shall provide a place on each form for the person collecting signatures to provide such person's name, street address, city, county, state, ZIP code and telephone number and to swear that such person is a resident of the city and that the signatures were collected inside the boundaries of the city. The collection of signatures for the petition shall begin on the day the municipal clerk provides official copies to the sponsor of the petition. A petition authorized by this section shall not be accepted by the council for verification if more than 60 days have elapsed since the date the sponsor of the petition first obtained copies of the petition from the municipal clerk.

*See* Exhibit 1 which is a true and accurate copy of Atlanta Municipal Code § 66-37.

*The Exigency of Plaintiffs' Case*

42.     The number of qualified signatures required to place a referendum on the ballot in a city with a population over 100,000 is 15% of the voters registered in the last general municipal election. O.C.G.A. § 36-35-3(2)(A).

43.     The home rule statute only gives sponsors a 60-day period in which to gather qualified signatures. O.C.G.A. § 36-35-3(b)(2)(C).

44.     The signature collecting period begins when "the governing authority provides official copies to the sponsor of the petition." O.C.G.A. § 36-35-3(b)(2)(C).

45.     On June 14, 2023, the interim Municipal Clerk for the City of Atlanta denied the initial referendum petition filed by the Cop City Vote coalition.

46.     In her email, Clerk Waldon stated that the reason for her denial was that the petition did not have a place for the person circulating petitions to provide their contact information or swear that he or she is a current resident of the City of Atlanta. Plaintiffs have attached a copy of that email as Exhibit 2.

47.     Based on the Clerk's denial, the Stop Cop City coalition thereafter included language where the circulator attests that they are a resident of the City of Atlanta.

48.    On June 21, 2023, Clerk Waldon approved a referendum petition and distributed official copies of the petition to the coalition.

49.    When the Clerk provided official copies of the petition to the coalition, it started the sixty-day clock to collect signatures (under the unconstitutional process of Atlanta Municipal Code § 66-37(b)).

50.    The Cop City Vote coalition estimates it needs to collect approximately 70,000 signatures to place the referendum on the ballot.

51.    The most important aspect of that campaign is having enough people to circulate petitions and gather signatures.

52.    Plaintiffs, and others with close geographic proximity to the proposed location, want to collect signatures as part of that effort but cannot do so if they are not current City of Atlanta residents.

53.    The residency requirement increases the burden on collecting signatures, and bars the Plaintiffs from collecting signatures on their own, and thereby deprives Plaintiffs of the opportunity to collect signatures on a matter on which they are politically engaged and that directly affects them.

## COUNT I
*Violation of the First Amendment*
*under 42 U.S.C. § 1983*

54.    Under Atlanta Municipal Code § 66-37(b), through O.C.G.A. § 36-35-3(b)
(2)(C), residency in the City of Atlanta is the only criterion for determining
whether Plaintiffs may lawfully circulate petitions for referendums.

55.    By contrast, the City of Atlanta's exercise of its home rule powers knows no
territorial limit. In its charter, the City reserves unto itself the power to "To acquire,
dispose of, and hold in trust or otherwise any real, personal, or mixed property, or
any interest therein, inside or outside the corporate boundaries of the city and to
dispose of said property or any interest therein by sale, lease, or easement." Atlanta
City Charter § 1-102(c)(6).

56.    The circulation of petitions and petitioning the government for redress of
grievances is core political speech because it involves both the expression of a
desire for political change and a discussion of the merits of the proposed change.

57.    The severe restriction on non-residents speech and petition rights must be
narrowly drawn to advance a compelling governmental interest.

58.    Plaintiffs live in unincorporated DeKalb County, near where the City of
Atlanta has decided to build the Training Center.

59.   Even though their own community bears the immediate impacts of the Training Center, ecologically and otherwise, Plaintiffs only ability to directly impact the City of Atlanta's decision-making process is through acting as circulators of this petition, but they are barred from that expressive conduct by Atlanta Municipal Code § 66-37(b).

60.   The residency restriction of Atlanta Municipal Code § 66-37(b), coupled with the high threshold of signatures and shortened time in which to gather those signatures, markedly reduces the pool of people who can circulate petitions and thus endangers any effort to successfully petition local governments to amend or repeal laws by popular vote.

61.   Plaintiffs therefore have a strong interest in participating and gathering signatures for a referendum to be voted upon by their City of Atlanta neighbors.

62.   Atlanta Municipal Code § 66-37(b), through O.C.G.A. § 36-35-3(b)(2)(C), bars Plaintiffs from gathering petition signatures because they are not City residents.

63.   Atlanta Municipal Code § 66-37(b) is not narrowly tailored to serve a compelling interest.

### *Request for Relief*

Plaintiff requests this Court:

a.  Hold a trial by jury on all issues so triable;

b.  Declare the residency requirement in Atlanta Municipal Code § 66-37(b), through O.C.G.A. § 36-35-3(b)(2)(C), violates the First Amendment on its face and as applied;

c.  Enter a preliminary and permanent injunction prohibiting Defendants from enforcing the residency requirement of Atlanta Municipal Code § 66-37(b);

d.  Enter a preliminary injunction requiring the Defendant City of Atlanta to issue new official copies of the referendum petition that removes any residency restriction for people circulating the petition;

e.  Enter a preliminary injunction that requires that the time period of O.C.G.A. § 36-35-3(b)(2)(C) for collecting signatures be restarted upon this Court's order establishing a constitutional process for signature collection and that all existing properly collected signatures be counted in the total of signatures collected.

f.  Award Plaintiff attorney's fees under 42 U.S.C. § 1988;

g.  Grant any relief to which Plaintiff is entitled as a matter of law or equity.

Submitted on July 6, 2023.

SPEARS & FILIPOVITS, LLC                          **Brian Spears**
315 W. Ponce de Leon Ave., Ste. 865               Georgia Bar No. 670112
Decatur, Georgia 30030
404-905-2225                                      **Jeff Filipovits**
jeff@civil-rights.law                             Georgia Bar No. 825553
wingo@civil-rights.law
bspears@civil-rights.law                          **Wingo F. Smith**
                                                  Georgia Bar No. 147896


                                                  **Gerald Weber**

Law Offices of Gerry Weber, LLC                   Georgia Bar No. 744878
Post Office Box 5391
Atlanta, Georgia 31107
404-522-0507
wgerryweber@gmail.com