# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| LISA BAKER, JACQUELINE DOUGHTERY, KENYANNA JONES, and AMELIA WELTNER, |  |
| Plaintiffs, | Case No. 1:23-cv-2999-MHC |
| v. |  |
| CITY OF ATLANTA and STATE OF GEORGIA |  |
| Defendants. |  |

## DEFENDANT CITY OF ATLANTA'S RESPONSE
## TO MOTION FOR PRELIMINARY INJUNCTION

Robert L. Ashe
Ga. Bar No. 208077
ashe@bmelaw.com
Jane D. "Danny" Vincent
Ga. Bar No. 380850
vincent@bmelaw.com
Matthew R. Sellers
Ga. Bar. No. 691202
sellers@bmelaw.com

BONDURANT MIXSON & ELMORE LLP
1201 W. Peachtree St. NE, Suite 3900
Atlanta, GA 30309
404-881-4100

*Attorneys for Defendant City of Atlanta*

# TABLE OF CONTENTS

**I.**   Plaintiffs are not likely to succeed on the merits because the
residency verification requirement does not violate their First
Amendment rights ..................................................................................2

    **A.**   *Strict scrutiny does not apply because the resident
verification requirement does not infringe on nonresidents'
political speech*..................................................................................3

    **B.**   *The concurring and dissenting opinions in* Buckley *suggest
the Supreme Court would uphold a residency restriction
on ballot initiative circulators*................................................6

    **C.**   *Residency requirements are legitimate restrictions on
the right to participate in the political process*........................8

    **D.**   *Plaintiffs' circuit court cases do not control the outcome here*..............11

**II.**   Because the referendum proposed in the ballot initiative is invalid,
Plaintiffs cannot show an irreparable injury that warrants preliminary
Relief.................................................................................................13

    **A.**   *In* Kemp v. City of Claxton, *the Georgia Supreme Court held
there is no statutory authority for the referendum Plaintiffs
seek to support*..................................................................................13

    **B.**   *The proposed referendum is futile and/or invalid because it violates
the constitutional prohibition on the impairment of contracts* ..............17

**III.**   The City's interest in ensuring the integrity of its political process
outweighs Plaintiffs' alleged injury ................................................19

**IV.**   If this Court finds the residency requirement unconstitutional,
the remedy is to strike down the petition ordinance in its entirety.................21

CONCLUSION .....................................................................................23

The U.S. Supreme Court has "uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68–69 (1978). After the General Assembly enacted the Georgia Municipal Home Rule Act in 1965 to give municipalities limited power to amend their charters (codified at O.C.G.A. § 36-35-3), the City of Atlanta ("City") adopted a political process to allow its citizens to petition the City Council to place referendums on the municipal ballot.[1] City of Atlanta Ordinance § 66-37. To comply with the Municipal Home Rule Act, this ballot initiative ordinance imposes only two restrictions on signature collection: (1) the signers of the petition must be registered Atlanta voters currently and at the time of the last general municipal election and (2) an Atlanta resident must verify that the signatures were collected within the city limits. *Id*. Plaintiffs do not contend that they, as nonresidents of Atlanta, should be allowed to sign the petition, but they do contend that the residency verification requirement violates their constitutional right to free speech. It does not.

---

[1] As discussed below in section II, O.C.G.A. § 36-35-3 does not authorize citizen referendums to repeal most city ordinances, and thus the petition at issue here is void. However, in order to focus the argument on the core First Amendment issue, Section I assumes, *arguendo*, the proposed referendum is valid.

Atlanta's ballot initiative ordinance does not prevent nonresidents from talking to residents, soliciting signatures, funding the referendum effort, organizing or conducting trainings, or any number of other speech and advocacy related efforts. The ordinance does not restrict Plaintiffs' participation in any material way—it simply requires that a resident must also participate in a manner that allows them to verify that the signatures were collected in compliance with the statutory requirements. Because any burden imposed by this requirement is "light" and "counterbalanced" by the "state interests supporting the ballot access scheme," it is "presumptively valid." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992). The Court should deny Plaintiffs' Motion for a Preliminary Injunction.

## I.     Plaintiffs are not likely to succeed on the merits because the residency verification requirement does not violate their First Amendment rights.

All election laws "invariably" impose "some burden" on the "right to associate with others for political ends." *Burdick*, 504 U.S. at 433. But because "subject[ing] every voting regulation to strict scrutiny…would tie the hands of States seeking to assure that elections are operated equitably and efficiently," the Supreme Court uses "a more flexible standard": when a regulation imposes a "severe" burden on First Amendment rights, courts should apply strict scrutiny, but when the regulation imposes only "reasonable, nondiscriminatory" restrictions, a state's interest in structuring its elections is "generally sufficient to justify the restrictions."

2

*Id.* at 434. Indeed, states allowing ballot initiatives "have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 191 (1999).

Notably, Plaintiffs do not discuss this standard at all. Instead, their brief quotes only selective case language about strict scrutiny and summarily assumes that is the correct framework for analyzing this ordinance. It is not. To the contrary, it is well established that residency requirements are legitimate restrictions on participation in the political process. *Holt*, 439 U.S. at 68–69 (collecting cases).

There are two U.S. Supreme Court cases that directly address who can circulate citizen referendum petitions: *Meyer v. Grant*, 486 U.S. 414 (1988) (states cannot ban paid circulators) and *Buckley,* 525 U.S. 182 (limiting circulators to only registered voters is unconstitutional). As discussed below, neither of these controlling cases prohibit the type of residency requirement in the Atlanta ordinance. Indeed, *Buckley* assumed, without deciding, that a residency requirement would be constitutional. *Buckley*, 525 U.S. at 197.

## A. *Strict scrutiny does not apply because the resident verification requirement does not infringe on nonresidents' political speech.*

In Georgia, signatures on municipal ballot initiative petitions must satisfy two statutory requirements: (1) the signatory must be a qualified voter and (2) the

signature must be collected within the city limits. *See* O.C.G.A. § 36-35-3(b)(2)(C). It is the City's responsibility to verify the first requirement—that signers are qualified voters. But because the City has no way to verify where the signatures were collected, the statute assigns this verification requirement to a city resident. That is a narrow and legitimate restriction on who can participate in the City's political process in that specific regard. Contrary to Plaintiffs' hyperbolic assertion, the ballot initiative ordinance does not prevent anyone from "participat[ing] in circulating a referendum petition."[2] The residency restriction applies only to those who can verify that the signatures were collected within the city limits. Because that verification does not involve, let alone restrict, "interactive communication," it is not "core political speech." *Meyer*, 486 U.S. at 421–22.

In *Meyer*, the Supreme Court considered a Colorado law that prohibited paying petition circulators. The plaintiffs argued that the ban impermissibly hindered their efforts to collect signatures on the petition. Under the Colorado law, a circulator was required to verify two things about the signer: that they are who their signature claims to be and that they are a registered voter. *Id*. at 417. Verifying these two things necessarily requires that the circulator interact personally with the signatory and this

---

[2] Pls' Mot. for Prelim. Inj. at 1. [Dkt. 2–1].

4

"interactive communication" is what the Supreme Court held to be "core political speech." *Id*. at 421–22. The Court then considered the burden imposed on the petition coalition's efforts to garner enough signatures to get the petition on the ballot. *Id*. at 422–23. The Court reasoned the prohibition on paying circulators was a significant burden because many supporters might not be able to go out and gather signatures for financial reasons (*e.g.,* childcare, work, or transportation). *Id*. at 23. Because the ban in *Meyer* likely prohibited a significant number of people from engaging in this interactive communication, the ban was unconstitutional.

Unlike the definition of circulator in *Meyer*, Atlanta's ballot initiative ordinance does not require a circulator verify anything personal about the signatory—it only requires that a city resident attest the collection process complied with state law, i.e., that the signatures were collected within city limits. This verification does not require a city resident to witness each signature, just that the resident participate in the collection process in a way that enables them to make the attestation.[3] Thus, nonresidents are free to solicit and witness signatures, and there is no limitation on their "interactive communication." Because the residency

-----

[3] The ordinance does not proscribe the manner of this participation, but one example is that a team of several circulators, including one Atlanta resident, could canvass a particular area. So long as the resident could attest that the signatures collected were within the city limits, that would satisfy the requirement.

verification does not burden Plaintiffs' "core political speech," Plaintiffs' First Amendment claim cannot succeed.

**B. *The concurring and dissenting opinions in* Buckley *suggest the Supreme Court would uphold a residency restriction on ballot initiative circulators.***

Ten years after *Meyer*, the Supreme Court again considered a citizen petition law in *Buckley,* 525 U.S. at 186. The Court in *Buckley* acknowledged that discerning "valid ballot access provisions from invalid interactive speech restrictions" requires courts to make "hard judgments," but it reiterated that there is "no litmus paper test" for that determination. *Id*. at 192. This time the challenged law required that circulators be registered voters. *Buckley* assumed, without deciding, that a residency requirement for circulators would be valid, and on that assumption, held that "the added registration requirement is not warranted." *Id*. at 197.

In particular, the Court observed that because only 65% of eligible Colorado voters were registered, the voter registration requirement excluded nearly a million eligible voters from gathering signatures. *Id*. at 194, n.15. The Court concluded that the exclusion of nearly a million eligible voters was a significant burden on the proponents' ability to collect signatures.

Although a residency requirement was not before the Court in *Buckley*, at least four justices would have upheld such a requirement. Justice Thomas' concurrence

posits that states have not just a legitimate interest, but a "compelling interest in ensuring that all circulators are residents." *Id*. at 211 (Thomas, J. concurring). And because the Colorado law excluded so many residents from participating in their own political process, Justice Thomas agreed with the majority that the voter registration requirement was not narrowly tailored to achieve that "compelling interest in insuring that all circulators are residents." *Id*.

Justices O'Connor and Breyer, in a partial dissent, argued that as a neutral qualification, the voter registration requirement only "incidentally and indirectly" burdened the interactive communication of the petition process and therefore did not violate the First Amendment. *Id*. at 218. Justice Rehnquist went even further in his dissent. He criticized the majority for adopting a "highly abstract" test—whether a ballot initiative restriction made a proposal less likely to appear on the ballot—that calls into question the validity of any reasonable regulation of petition circulation. *Id*. at 228. If these Justices agreed that a voter registration requirement was permissible, then it follows that they would support a straight residency requirement.

Thus, the position all the Justices had in *Buckley* is the opposite of Plaintiffs' argument here. The Justices all agreed that a restriction that prevented ***residents*** from engaging in ***their own community's*** ballot initiative was unconstitutional. But

Plaintiffs here want this Court to say the opposite: that preventing nonresidents from participating in a political process that is ***not*** theirs, is unconstitutional.

### C. *Residency requirements are legitimate restrictions on the right to participate in the political process.*

Plaintiffs' claims also fail because "a government unit may legitimately restrict the right to participate in its political process to those who reside within its borders." *Holt*, 439 U.S. at 68–69.

The Plaintiffs here are residents of unincorporated DeKalb County who oppose construction of the Atlanta public safety training center.[4] Each Plaintiff lives, or has recently lived, within four miles of the training center site, which is also located in unincorporated DeKalb County.[5] Having admittedly failed to "influenc[e] the legislative process through public comment,"[6] Plaintiffs now wish to participate in the City's ballot initiative process regarding the City's ordinance and lease. But the ballot initiative ordinance is a political process by which a city opts to (but does not have to) give ***its residents*** the power to directly petition ***their*** city council to put

---

[4] Complaint at 1 [Dkt. 1]

[5] *Id.*

[6] *Id.*, ¶ 17. It is noteworthy that the City could—but does not—prevent nonresidents from even offering public comment. *Rowe v. City of Cocoa*, 358 F.3d 800, 803 (11th Cir. 2004) (city council rule that limited public comments to residents and taxpayers did not violate the First or Fourteenth Amendments).

a referendum on **their** ballot. Nonresidents simply do not have a constitutional right to participate in that optional political process. *Id*.

The Supreme Court's decision in *Holt* is on all fours with this case. The plaintiffs in *Holt*, like Plaintiffs here, were (1) residents of an unincorporated community (2) who lived within three miles of the city limits, and (3) claimed they had a constitutional right to participate in the municipality's political process because it affected them. *Id*. at 61–63. The Supreme Court disagreed.

At issue in *Holt* was the municipality's expansion of police jurisdiction three miles into the unincorporated areas bordering the city limits.[7] This expansion subjected the unincorporated residents to the city's criminal jurisdiction, sanitary regulations, and business licensing powers. But because the expansion of these powers did not extend the city's borders, the plaintiffs, being nonresidents, could not vote in municipal elections. The *Holt* plaintiffs contended this "extraterritorial" expansion of power required a concomitant extension of the right to vote under the Due Process Clause. The Supreme Court disagreed. *Id*. at 66. In rejecting the plaintiffs' challenge, the Court reiterated its long-standing case law that "a

---

[7] Like the Atlanta ordinance, the expansion power in *Holt* was granted and governed by state statute.

government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Id.* at 68–69.

Nor did it matter that the plaintiffs in *Holt* alleged there were uniquely affected by these municipal actions. The Court observed that a city's decisions often "inescapably affect individuals living immediately outside its borders." *Id*. at 69. Indeed, "the granting of building permits for high rise apartments, industrial plants, and the like…unavoidably contributes to problems of traffic congestion, school districting, and law enforcement immediately outside the city," and that the "condemnation of real property on the city's edge for construction of a municipal garbage dump or waste treatment plant would have obvious implications for neighboring nonresidents." *Id.* Yet, "no one would suggest that nonresidents likely to be affected by this sort of municipal action have a constitutional right to participate in the political processes bringing it about." *Id*.

Plaintiffs' complaint here mirrors the complaints in *Holt*: they believe they have a right to participate in the City of Atlanta's political process because they are affected by the City's extraterritorial actions. But Plaintiffs here can fare no better than those in *Holt*. Plaintiffs' proximity to the training center site, even if that site is outside the city limits, does not confer a unique constitutional right to participate in the City's political process.

**D.  *Plaintiffs' circuit court cases do not control the outcome here.***

As discussed above, the U.S. Supreme Court cases *Meyer* and *Buckley* are the only controlling precedent here, and neither prohibits a residency requirement for signature collection. Not only is this Court not bound by Plaintiffs' circuit court cases, but each is either distinguishable or unpersuasive, or both.

First, six of the eight cases Plaintiffs cite do not mention *Holt* at all.[8] They do not consider or discuss the Supreme Court's long-standing case law that "a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Holt*, 439 U.S. at 68–69. *Holt* is binding precedent, and its omission from these cases undermines their analysis and conclusions. Second, three of the cases are about a requirement that residents personally witness the signatures—a requirement that is not in the Atlanta ordinance or state law.[9] And third, two of the of the cases are voter-registration restrictions, not residency restrictions.[10]

---

[8] *Leman v. Bd. of Election*, 232 F.3d 135 (2d Cir. 2000); *Libertarian Party of Va. v. Judd*, 718 F.3d 308 (4th Cir. 2013); *Pool v. City of Houston*, 978 F.3d 307 (5th Cir. 2020); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008); *Pierce v. Jacobsen*, 44 F.4th 853 (9th Cir. 2022); *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008).

[9] *Leman*, 232 F.3d at 139; *Libertarian Party of Va.*, 718 F.3d at 311; *Nader*, 545 F.3d at 463.

[10] *Pool*, 978 F.3d at 309; *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000).

This leaves only one case that both aligns with the facts of this case and acknowledges *Holt*'s directive that governments may restrict their political processes to their residents, *We the People PAC v. Bellows*, 40 F.4th 1 (1st Cir. 2022). But the court in *Bellows* dismissed the application of *Holt* summarily, concluding, without discussion, that *Holt* was limited to voting rights and that circulating official petitions for a ballot initiative was not a "political process" to which residency restrictions could apply. But there is no reason to construe *Holt* so narrowly. In fact, *Buckley* itself suggests the opposite conclusion: "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley*, 525 U.S. at 191. *Buckley* thus suggests that, for Constitutional purposes, ballot initiatives are just as much a part of the "political process" as voting in elections.

Nor does *Bellows* make sense when placed alongside public comment cases from the Eleventh Circuit, like *Rowe v. City of Cocoa,* 358 F.3d at 803. If a city can limit public comment at city council meetings to residents, and cities can limit voting to residents, surely cities can also limit the ballot initiative petition process— indisputably a part of the "political process"—to residents. The residency requirement is thus a reasonable restriction on participation in the political process of the kind the Eleventh Circuit has held the City may constitutionally impose.

There is no Eleventh Circuit case addressing petition circulation, and thus this Court is bound only by the decisions of the U.S. Supreme Court. Although no Supreme Court case is directly on point, taken together *Meyer* and *Buckley* support the constitutionality of Georgia and Atlanta's residency requirement for petition verifications.

## II. Because the referendum proposed in the ballot initiative is invalid, Plaintiffs cannot show an irreparable injury that warrants preliminary relief.

The proposed referendum here is invalid on two grounds. First, the Georgia Supreme Court has held that O.C.G.A. § 35-36-3 does not authorize referendums to repeal city ordinances. Second, because the petition's objective is to repeal an ordinance ***authorizing*** the City to enter a lease agreement—an authorization that has already been used—the proposed referendum would not invalidate the lease *ex post facto*. Nor could the referendum invalidate the lease, lest it violate the constitutional prohibition on impairment of contracts. Because the referendum is invalid, and therefore cannot get on the ballot, Plaintiffs do not have an irreparable injury as to this referendum that warrants preliminary injunctive relief.

### A.  *In* **Kemp v. City of Claxton,** *the Georgia Supreme Court held there is no statutory authority for the referendum Plaintiffs seek to support.*

The Municipal Home Rule Act of 1965 ("the Act") governs municipal ballot initiative petitions. O.C.G.A. § 35-36-3. In 1998, the Georgia Supreme Court

unanimously held that the Act permits citizen referendums only to amend city charters. *Kemp v. City of Claxton*, 269 Ga. 173 (1998). Because the petition here seeks to repeal a City ordinance unrelated to the City's charter, it is void on its face.[11]

In *Kemp*, the plaintiffs sought to use the Act's petition and referendum process to repeal the City of Claxton's legislative consent to the closure of certain railroad crossings. *Id*. at 173–74. The Georgia Supreme Court examined the Act and its history and concluded that because the Act's "primary purpose…was to authorize municipalities to amend their charters by their own actions," the Act's "petition and referendum provision is intended to be available ***only*** when the proposed amendment is intended to affect a city charter." *Id*. at 175–76 (emphasis added). The Act was not, in other words, intended to be a broad and fulsome experiment in direct democracy unseen in Georgia history, before or since.

The petition and referendum process set out in the Act thus gives a municipality's voters only the opportunity to weigh in on charter changes, not a right to wield broad legislative power by amending or repealing "all ordinances and resolutions." *Id.* at 176. The Supreme Court held that the *Kemp* plaintiffs' construction of the Act as permitting citizen-led repeal of any and all ordinances or

---

[11] *See* Complaint at 1–2, ¶¶ 38, 42–43 [Dkt. 1]; City of Atlanta Ordinance 21-O-0367 (authorizing the building of the Atlanta Public Safety Training Center).

resolutions was (a) inconsistent with the Act's text and (b) would amount to an unintended delegation of the "General Assembly's legislative power." *Id.* The Court unanimously "reject[ed] plaintiffs' argument that the electorate can directly exercise such general legislative power," and held that "[t]he petition procedure of O.C.G.A. § 36-35-3(b)(2) applies only to amendments to municipal charters." *Id.* Thus, the Court concluded, the petitions were nullities. *Id*. Because the petition here similarly seeks to repeal an ordinance unrelated to an amendment to the City's charter, it is also unlawful.[12]

Plaintiffs will undoubtedly direct the Court to the recent Georgia Supreme Court opinion *Camden County v. Sweatt*, 315 Ga. 498 (2023). In *Camden County*, the Court examined whether the Georgia Constitution's **county** home rule powers provisions authorized a petition and referendum process to repeal county ordinances related to an unexecuted option contract for purchasing land on which to construct a rocket launch facility. *Id.* at 498–99; *see also* Ga. Const. Art. IX, § II, ¶ I. Ultimately, the Supreme Court concluded that those constitutional provisions authorized the petition and referendum sought by Camden County electors to repeal the land purchase option contract—an option contract that, as far as the record shows, was

---

[12] *See, e.g.,* Complaint ¶¶ 7–8.

never consummated or otherwise acted upon, except to legislatively extend the option period. *Camden County*, 315 Ga. at 511.

The *Camden County* court acknowledged that its holding was "in tension with *Kemp*" because the Municipal Home Rule Act "contains a provision somewhat similar to" the constitutional provision regarding counties applicable in *Camden County*. *Id.* But ultimately, the Court decided that because the municipal home rule statute and the county home rule constitutional provisions are "completely separate legal provision[s], the holding in *Kemp* does not control" how the Constitution's county-only provisions should be construed. *Id.* at 512. Indeed, *Camden County* expressly did not "consider at this time whether *Kemp* should be overruled." *Id.* at 512–13

Someday, the Georgia Supreme Court may reassess *Kemp*, although there are important differences between the two "somewhat similar" home rule provisions, including the fact that one is constitutionally inscribed, and the other is statutory. *Id.* at 511. Today, however, *Kemp* is still good law. Unless and until the Supreme Court decides to jettison or modify it, *Kemp* is binding on all courts seeking to apply Georgia law, including this one. *See World Harvest Church, Inc. v. GuideOne Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009). *Accord Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,* 490 U.S. 477, 484 (1989) ("We do not suggest that the

Court of Appeals on its own authority should have taken the step of renouncing *Wilko.* If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

As long as *Kemp* is the law, Plaintiffs lack standing to assert an Article III injury here, as state law makes the petition and referendum they seek to support a nullity. See *Davidson v. Dawson*, Case No. 1:04-cv-00612-RCT, 2006 WL 8446151, at *3–4 (D. Idaho May 18, 2006) (holding that plaintiff lacked standing to challenge a residency restriction on a ballot petition where the petition was precluded by state law—"because Hailey did not have the power or authority to enact Plaintiff's proposed ordinance, no injury has resulted from Defendant's denial of his initiative petition. Plaintiff also cannot show that his alleged injury would be redressed by a favorable decision."). Plaintiffs cannot get preliminary injunctive relief when state law will void their referendum effort on other grounds that they have not challenged.

**B.    *The proposed referendum is futile and/or invalid because it violates the constitutional prohibition on the impairment of contracts.***

The petition currently being circulated seeks a referendum to repeal a 2021 City of Atlanta ordinance which authorized then-Atlanta Mayor Keisha Lance Bottoms to execute a lease of City property to the Atlanta Police Foundation for

construction of the Training Center.[13] The Mayor executed this lease on October 12, 2021, and the Police Foundation has proceeded with construction.

Plaintiffs' desired referendum is futile because it seeks only to revoke the authorization to *enter* the lease. Because that authorization has already been used, and the leased signed, revoking the authorizing ordinance does not, *ex post facto*, undo the lease agreement itself. Repeal of a years' old ordinance cannot retroactively revoke authorization to do something that has already been done.

But even if the referendum could claim to result in a revocation or cancellation of the lease, it would still be invalid because it would amount to an impermissible impairment of that contract. *See* U.S. Const. art. I, § 10, cl. 1; Ga. Const. art. I, § I, ¶ X; *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 9–14 (1977); *City of Owensboro v. Cumberland Tel. & Tel. Co.*, 230 U.S. 58, 66, 72–74 (1913) (repeal of an ordinance granting a franchise to use municipal property invalid impairment of contract); *City of Cleveland v. Cleveland City RR Co.,* 194 U.S. 517, 534–38 (1904); *Jonesboro Area Athletic Ass'n. v. Dickson*, 227 Ga. 513, 519–20 (1971) (city bound by lease, and cannot later unilaterally cancel it).

---

[13] Complaint ¶¶ 7–8.

Because the proposed referendum here is invalid and/or a nullity, it cannot be placed on the ballot. Given the futility of the petition—and thus the signature collection efforts—Plaintiffs cannot show an irreparable injury that warrants preliminary relief.

### III. The City's interest in ensuring the integrity of its political process outweighs Plaintiffs' alleged injury.

The balance of equities and the public interest "merge when, as here, the Government is the opposing party." *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (quotation omitted). Neither the equities nor the public interest would be served by the injunction Plaintiffs request. The City has "a compelling interest in preserving the integrity of its election process." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371–72 (11th Cir. 2020) (quotation omitted). Indeed, the injunction Plaintiffs request will undermine the City's "interests in conducting an efficient election, maintaining order, quickly certifying election results, and preventing voter fraud." *New Ga. Project v. Raffensberger*, 976 F.3d 1278, 1284 (11th Cir. 2020). "[T]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). Plaintiffs would have the Court disrupt the signature-collecting process, not preserve the status quo.

Moreover, Plaintiff's request is untimely and would disrupt a process that is already well underway. The injunction would thus violate "what has come to be called the *Purcell* principle," which "teaches that federal district courts ordinarily should not enjoin state election laws in the period close to an election." *League of Women Voters of Fla., Inc.*, 32 F.4th at 1370–71 (quotation omitted). Twenty-three days of the sixty-day period for gathering signatures have already elapsed. *See* Atlanta Code § 66-37(b). Fully half the period will have passed by the time Plaintiffs file their reply. The *Purcell* principle counsels against changing the rules midway through this process.

This is particularly true of Plaintiffs' request to restart the sixty-day clock for gathering signatures. Plaintiffs do not argue that this restriction impinges on the First Amendment. "Extending the date by which" signatures must be submitted "fundamentally alters the nature of the" petition process. *Republican Nat'l Committee v. Democratic Nat'l Committee*, 140 S. Ct. 1205, 1207 (2020). The City has an indisputable interest in administering the petition process according to the rules spelled out in the Home Rule Act and the ballot initiative ordinance; changing them now would harm the public interest in a prompt and fair process.

## IV.  If this Court finds the residency requirement unconstitutional, the remedy is to strike down the petition ordinance in its entirety.

If the Court finds the residency requirement unconstitutional—which it should not, as set out above—then the correct remedy is to enjoin the petition process in its entirety, not to sever and strike the residency requirement and extend the statutorily prescribed ballot collection period, as Plaintiffs request. This is true of both the Municipal Home Rule Act, O.C.G.A. § 36-35-3(b), and the ordinance, Atlanta City Code, § 66-37, which are substantively identical.

"Severability is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). In Georgia, a court cannot sever the unconstitutional part of a law if severance "would result in a statute that fails to correspond to the main legislative purpose, or give effect to that purpose." *DaimlerChrysler v. Ferrante*, 281 Ga. 273, 275 (2006) (quotation omitted). Rather, if "the objectionable part is so connected with the general scope of the statute that, should it be stricken out, effect cannot be given to the legislative intent, the rest of the statute must fall with it." *Id.* at 274–75. By these standards, this Court cannot sever the residency requirement from the remainder of the petition process; they rise or fall together.

A Georgia municipality "has no inherent power; it may only exercise power to the extent it has been delegated authority by the state. A municipality's allocations of power from the state must be strictly construed." *H.G. Brown Family Ltd. P'ship*

21

*v. City of Villa Rica*, 278 Ga. 819, 819–20 (2005) (citations omitted). The residency requirement comes directly from O.C.G.A. § 36-35-3(b), which "is a delegation of the General Assembly's legislative power to the municipalities." *Kemp*, 269 Ga. at 176; *see also* Ga. Const. art. 9, § 2, ¶ II. In delegating this power, the General Assembly gave municipalities no flexibility to adopt other or different requirements than the ones the legislature spelled out. While the State does not have to delegate any legislative power to cities, when it does so, those powers must be strictly adhered to, including their restrictions. *See H.G. Brown Family*, 278 Ga. at 819–20.

As noted, the Home Rule Act imposes only two restrictions on signature collection: signatories must have been registered to vote in the last municipal election, and a City resident must attest that signatures were collected inside the City limits. *See* O.C.G.A. § 36-35-3(b)(2)(C). Thus, Plaintiffs are asking this Court to strike down half of the accountability measures the General Assembly included in its ballot initiative authorization. If the General Assembly itself declined to give cities the option to skip the residency requirement—one of only two in the statute—that requirement must be material to the delegation of this legislative power in the first instance. Severing the residency verification requirement would fundamentally change the municipal ballot initiative process the General Assembly designed, and

this Court should not judicially create a process that the legislature declined to give the City the power to enact.

Finally, reinforcing this conclusion, the Municipal Home Rule Act does not contain a severability clause. A "severability clause in an act reverses the usual presumption that the legislature intends the act to be an entirety." *City Council of Augusta v. Mangelly*, 243 Ga. 358, 363 (1979). The reverse is also true. Absent a severability clause, the Court must apply the "usual presumption" that the residency requirement forms part of the "entirety" of the Home Rule Act. *Id.* Here, the presumption also accords with the limited delegation the General Assembly made.

In short, the General Assembly's goal in enacting the petition process was to allow cities to amend their own charters—but only on the General Assembly's narrow terms. It expressly did not intend allow nonresidents of a municipality to be involved in exercising its delegated power to amend city charters. The Court should thus enjoin the petition process if it finds the residency requirement unconstitutional.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

This 14th day of July, 2023.

_/s/ Robert L. Ashe III_
Robert L. Ashe III
Georgia Bar No. 208077
ashe@bmelaw.com
Jane D. Vincent
Georgia Bar No. 380850
vincent@bmelaw.com
Matthew R. Sellers
Georgia Bar No. 691202
sellers@bmelaw.com
**BONDURANT MIXSON &
ELMORE LLP**
1201 W. Peachtree St., Suite 3900
Atlanta, Georgia 30309
404-881-4100

_Counsel for City of Atlanta_

24

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in compliance with N.D. Ga. L.R. 5.1B. This document has been prepared in Times New Roman 14-point font.

This 14th day of July, 2023.

*/s/ Robert L. Ashe III*
Robert L. Ashe III
Georgia Bar No. 208077
ashe@bmelaw.com

## **CERTIFICATE OF SERVICE**

I certify that I have served the foregoing DEFENDANT CITY OF ATLANTA'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION by filing the same via the CM/ECF system which will electronically perfect service on all counsel of record.

This 14th day of July, 2023.

/s/ Robert L. Ashe III
Robert L. Ashe III
Georgia Bar No. 208077
ashe@bmelaw.com