**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 23-12469

————————————————

LISA BAKER,

JACQUELINE DOUGHERTY,

KEYANNA JONES,

AMELIA WELTNER,

*Plaintiffs-Appellees,*

*versus*

CITY OF ATLANTA,

*Defendant-Appellant,*

STATE OF GEORGIA,

*Defendant.*

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-02999-MHC

————————————————

Before NEWSOM, BRANCH, and LUCK, Circuit Judges.

BRANCH, Circuit Judge:

Appellees Lisa Baker, Jacqueline Dougherty, Keyanna Jones, and Amelia Weltner, live in DeKalb County, outside the city limits of Atlanta ("the City"). They desire to collect signatures inside the City as part of a local referendum petition aimed at repealing a city ordinance that authorized the lease of land owned by the City in Dekalb County to the Atlanta Police Federation for the construction of a new training facility. However, the Appellees' residency posed a barrier to their signature collection efforts because § 66-37(b) of the City of Atlanta Municipal Code imposes a requirement that signature gatherers for local referendum petitions be residents of the City. Thus, they filed a complaint against the City challenging the constitutionality of the signature gatherer residency requirement, arguing that it violated their First Amendment rights. They also sought a preliminary injunction.

The district court granted the motion for a preliminary injunction and enjoined the City from enforcing the portion of § 66-37(b) that requires that the person collecting signatures be a resident of the City. The district court also ordered that the 60-day period for collecting signatures would restart upon the City's issuance of new petitions that removed the requirement that the person collecting signatures be an Atlanta resident and ordered that all signatures collected previously would still be counted.

The City appealed and obtained a stay of the injunction. After review and with the benefit of oral argument, we conclude

23-12469                 Opinion of the Court                 3

that the plaintiffs cannot show irreparable harm because, under *Kemp v. City of Claxton*, 496 S.E.2d 712 (Ga. 1998), they cannot use a referendum petition to challenge a city ordinance. In other words, they have no right to the petition process they seek to utilize; accordingly, they cannot show irreparable harm as required for injunctive relief. Therefore, we vacate the injunction and remand for further proceedings.

## I.     Background

In 2021, the City of Atlanta adopted ordinance 21-O-0367 which authorized then-Mayor Keisha Lance Bottoms to lease land owned by the City in DeKalb County to the Atlanta Police Federation for the construction of a new public safety training facility ("the leasing ordinance"). The Mayor executed a lease agreement, and the City Council dedicated significant funds toward the project. Construction on the new facility is now substantially complete.

In June 2023, a group of individuals and organizations (the "coalition") filed a referendum petition with the Municipal Clerk of the City of Atlanta, seeking to repeal the leasing ordinance and prevent construction of the facility. Initially, the municipal clerk rejected the coalition's referendum petition "as to form" because the draft provided did not include the required section for the signature gatherer to provide his name and contact information and attest that he was a resident of Atlanta and that the signatures on the petition were collected within the city of Atlanta. The coalition submitted a revised petition. The municipal clerk

4                    Opinion of the Court                    23-12469

ultimately "approve[d] [the petition] as to form" and issued official copies of the petition for use in collecting signatures on June 21, 2023.[1]  The petition included a section for signers of the petition to swear they were City of Atlanta residents and registered voters in the last municipal election and provide their signature, printed name, date, address, phone number, and birthdate.  And the signature gatherers had to swear that they were a registered elector in the City of Atlanta (*i.e.*, a City resident) and that the signatures were collected within the boundaries of the City.

Pursuant to § 66-37 of the City of Atlanta Municipal Code, which governed the coalition's petition efforts, upon the issuance of the approved petition by the municipal clerk on June 21, 2023, the coalition had 60 days to collect approximately 70,000 signatures.  *See* City of Atlanta, Ga. Code of Ordinances § 66-37(b).

Because the requirements of § 66-37 of the Municipal Code are at issue in this case, it is necessary to first examine the language of that section of the code before continuing with the procedural history of the case.  That section provides as follows:

> (a)    Whenever 15 percent of the registered voters, as disclosed by registration lists of the last preceding general municipal election, shall request, in a petition filed with the municipal clerk, amendments to the Charter or amendments to or repeals of ordinances

---

[1] The municipal clerk noted, when approving the petition, that "this approval as to form does not reflect any judgment or agreement by anyone at the City as to the lawfulness or substantive validity of the petition itself."

or resolutions which may have already been adopted by the council, the amendments or repeals shall thereafter be submitted to the qualified voters of the city. Such petition shall specifically set forth the exact language of the proposed amendment or repeal. The council shall determine the validity of such petition within 50 days of its filing. If such petition is determined valid, within one week the council shall issue the call for a special election for the purpose of submitting such amendment or repeal to the registered electors of the city for their approval or rejection. The council shall set the date of the special election as provided in O.C.G.A. § 21-3-53. The council shall cause a notice of the date of the election to be published in a newspaper of general circulation once a week for two weeks immediately preceding such date. The voting on questions submitted to the people at the special election provided for in this section in what is known as the initiative and referendum shall be held in the same manner as the general election, under the same methods, and the result thereof shall be canvassed in the same manner and declared and reported to the council for confirmation. If the majority of the votes are cast against the ordinance or resolution, it shall be thereby repealed and revoked and shall not thereafter be of any effect nor shall it thereafter be adopted by the council until resubmitted to and adopted by the qualified voters of the city in the same manner as originally submitted. If a majority of the votes are cast in the affirmative, the ordinance or resolution

shall stand and be effective in the same manner as other ordinances or resolutions of the city. If the council determines that the petition is not valid, it shall publish in detail, in a newspaper of general circulation in the week immediately following the date on which the petition is declared to be not valid, the reasons why such petition is not valid.

(b)   The sponsor of a petition authorized by this section shall obtain copies of all official petitions from the municipal clerk. The municipal clerk shall approve all petitions as to form. The municipal clerk shall provide a place on each form for the person collecting signatures to provide such person's name, street address, city, county, state, ZIP code and telephone number and to swear that such person is a resident of the city and that the signatures were collected inside the boundaries of the city. The collection of signatures for the petition shall begin on the day the municipal clerk provides official copies to the sponsor of the petition. A petition authorized by this section shall not be accepted by the council for verification if more than 60 days have elapsed since the date the sponsor of the petition first obtained copies of the petition from the municipal clerk.

(c)   The council shall be authorized to submit to the qualified voters of the city at any election any ordinance or resolution which it may deem proper. If a majority of voters shall vote for this ordinance or resolution, it shall be adopted. If a majority of the votes so cast are against the resolution or ordinance,

it shall be defeated and shall not thereafter be adopted by the council until resubmitted to and adopted by the qualified voters of the city.  If it receives a majority vote of the people and becomes effective, it can only be repealed by a majority vote of the qualified voters at a special election. . . .

City of Atlanta, Ga. Code of Ordinances § 66-37.

Municipal Ordinance 66-37 is derived from—and is virtually identical to—Georgia's Home Rule for Municipalities Act, O.C.G.A. § 36-35-3 ("Home Rule Act").  The Home Rule Act provides, in relevant part, as follows:

(a) The governing authority of each municipal corporation shall have legislative power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government for which no provision has been made by general law and which are not inconsistent with the Constitution or any charter provision applicable thereto.  Any such charter provision shall remain in force and effect until amended or repealed as provided in subsection (b) of this Code section. . . .

(b) Except as provided in Code Section 36-35-6, a municipal corporation may, as an incident of its home rule power, amend its charter by following either of the following procedures:

. . . .

(2)(A)    Amendments    to    charters    or

amendments to or repeals of ordinances, resolutions, or regulations adopted pursuant to subsection (a) of this Code section may be initiated by a petition, filed with the governing authority of the municipal corporation, containing, [a certain percentage of signatures based on the relevant population of the municipality]. . . .

(C) The sponsor of a petition authorized by this paragraph shall obtain copies of all official petitions from the clerk of the governing authority.    The clerk of the governing authority shall approve all petitions as to form. *The clerk of the governing authority shall provide a place on each form for the person collecting signatures to provide his or her name, street address, city, county, state, ZIP Code, and telephone number and to swear that he or she is a resident of the municipality affected by the petition* and that the signatures were collected inside the boundaries of the affected municipality. The collection of signatures for the petition shall begin on the day the clerk of the governing authority provides official copies to the sponsor of the petition.    A petition authorized by subparagraph (A) of this paragraph shall not be accepted by the governing authority for verification if more than 60 days have elapsed since the date the sponsor of the petition first obtained copies of

23-12469                 Opinion of the Court                 9

> the petition from the clerk of the governing
> authority.

O.C.G.A. § 36-35-3 (emphasis added).

With these statutes in mind, we turn back to the events giving rise to the present case. Appellees Baker, Dougherty, Jones, and Weltner live in DeKalb County—outside the city limits of Atlanta but near the proposed training facility—and they oppose the construction of the training facility and desire to assist with signature collection for the referendum petition.[2] However, because of § 66-37(b)'s residency requirement for signature gatherers, they were unable to collect signatures. Therefore, on July 6, 2023, they filed a complaint, along with a motion for a preliminary injunction, against the City[3] challenging the constitutionality of § 66-37(b)'s requirement that signature gatherers be residents of the City, arguing that it violated their First Amendment rights because it prevented them from collecting signatures for the referendum petition. Accordingly, they requested (1) a declaration that the signature gatherer residency requirement in § 66-37(b) violates the First Amendment on its face and as applied; (2) a preliminary and permanent injunction prohibiting the City from enforcing the residency requirement in

---

[2] No one disputes that these individuals are not the petition's sponsors or members of the coalition.

[3] Initially, the State of Georgia was also a named defendant, but the State asserted that it was immune from suit pursuant to the Eleventh Amendment and that it did not consent to jurisdiction. Thereafter, the plaintiffs filed a motion to dismiss the State as a party, which the district court granted.

§ 66-37(b);[4] (3) a preliminary injunction requiring the City to issue new referendum petitions without the signature gatherer residency restriction; (4) a preliminary injunction that restarted the 60-day period for collecting signatures upon the issuance of the court's order with the provision that all existing previously collected signatures be counted; and (5) attorney's fees.

The City opposed the request for injunctive relief, arguing that the plaintiffs did not satisfy the four necessary requirements for obtaining a preliminary injunction.  First, it argued that there was not a substantial likelihood of success on the merits because § 66-37(b)'s residency requirement did not infringe on a nonresident's political speech and was therefore not subject to strict scrutiny.  Second, the City argued that the proposed referendum was invalid because, among other reasons,  in *Kemp v. City of Claxton*, 496 S.E.2d 712 (Ga. 1998), the Supreme Court of Georgia held that O.C.G.A. § 36-35-3(b)(2), from which § 66-37(b) derives, can be used only to amend city charters and does not apply to city ordinances.  Third, the City argued that its interest in ensuring the "integrity of its political process" outweighed the plaintiffs' alleged injury.  And finally, the City argued that, if the residency requirement was unconstitutional, the appropriate remedy was to strike down the ordinance in its entirety and enjoin

---

[4] Section 66-37(b) also imposes a residency requirement for individuals who sign the petition.  *See* City of Atlanta, Ga. Code of Ordinances § 66-37(b).  That requirement was not challenged below and is not at issue in this appeal.

23-12469                 Opinion of the Court                           11

the entire petition process—not sever portions as the plaintiffs requested.

On July 27, 2023—approximately 35 days into the signature collection period—the district court granted the motion for a preliminary injunction after applying the traditional four-factor test for preliminary injunctive relief.[5]  First, the district court found that the plaintiffs had shown a substantial likelihood of success on the merits.  The district court reached this conclusion by first determining that § 66-37(b)'s signature gatherer residency restriction was subject to strict scrutiny based on the Supreme Court's decisions in *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), as well as decisions from a number of other circuits to have considered similar requirements.  The district court explained that

> the residency requirement clearly limit[ed] the number of persons who [could] promote the petition's message thereby limiting the potential number of the City's residents who [could] receive the political message and [made] it less likely that the

_____

[5] "A district court may grant a preliminary injunction only if the moving party establishes that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020) (footnote omitted).

proponents of the petition [could] gather sufficient
signatures to place the initiative on the ballot.

Therefore, the court concluded that, under *Meyer*, the residency
requirement imposed "a severe burden on core political speech"
and was subject to strict scrutiny.

The district court then found that the residency requirement
was not narrowly tailored to serve a compelling governmental
interest, noting that the City failed to present any argument on this
point.  In reaching this conclusion, the district court rejected the
City's argument that the restriction served a legitimate interest of
restricting the right to participate in the political process only to the
City's own residents, explaining that the restriction was not
narrowly tailored to serve that interest given that "only residents
can sign petitions and vote in referendum elections."  Accordingly,
the district court concluded that the plaintiffs had established a
substantial likelihood of success on the merits for purposes of
obtaining a preliminary injunction.

Second, the district court concluded that the plaintiffs had
established that they would suffer irreparable harm in the absence
of an injunction because it was well-established that "[t]he loss of
First Amendment freedoms, for even minimal periods of time,
unquestionably constitutes irreparable injury."  The district court
noted the City's contention that the referendum itself was invalid
under the Supreme Court of Georgia's decision in *Kemp*, but
concluded that "the issue of the ultimate validity of the proposed

referendum to [the leasing ordinance] [was] not ripe for decision by this [c]ourt."

Finally, the district court explained that the remaining two preliminary injunction factors—the balance of equities/harm to opposing party and the public interest—merged because the government was the opposing party.  The district court then concluded that these factors weighed in favor of the request for injunctive relief.

Consequently, the district court enjoined the City from "enforcing the portion of . . . § 66-37(b) that requires the person collecting signatures to swear that such person is a resident of the City of Atlanta"; ordered the municipal clerk to issue new copies of the referendum petition that removed "the requirement that the person collecting signatures swear that such person is a resident of the City of Atlanta"; and ordered that the 60-day statutory period for collecting signatures would restart on the date the new referendum petitions were issued, although all valid signatures previously collected "shall be counted" along with any new signatures collected at the end of the new collection period.

The City promptly appealed and obtained a stay of the injunction from this Court.  We later directed the parties to address whether they had satisfied the requirements for Article III standing and whether the appeal was moot in light of the completion of construction on the facility.

We begin our analysis by addressing the issue of whether case is moot.  Because we conclude that the case is not moot, we

then address whether the plaintiffs have Article III standing. Based on our conclusion that they have Article III standing, we proceed to review the merits of the preliminary injunction.

## II.    Discussion

### A.  Mootness

Article III of the Constitution limits our jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. As a result, "we cannot entertain [an] appeal unless an actual dispute continues to exist between the parties." *Bourgeois v. Peters*, 387 F.3d 1303, 1307–08 (11th Cir. 2004). "If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to afford the plaintiff or appellant meaningful relief, then the case becomes moot and must be dismissed." *Graham v. Att'y Gen., State of Ga.*, 110 F.4th 1239, 1244 (11th Cir. 2024) (quotations omitted). "[M]ootness is a jurisdictional issue that must be resolved at the threshold." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1227 n.14 (11th Cir. 2000). We review *de novo* whether a case is moot. *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007).

The City argues that the case is now moot because construction of the facility is substantially complete, and the plaintiffs' goal with the referendum has always been to stop construction of the facility, which means there is no meaningful relief available. We disagree.

Although the plaintiffs' ultimate goal may have been to stop the construction of the training facility, it does not follow that there

is no meaningful relief available to them in this appeal. The plaintiffs in this case sought to enjoin the City from enforcing a residency requirement for signature gatherers of a referendum petition. The referendum petition sought to repeal the ordinance that authorized the lease of the land for the facility—an ordinance and lease that still exist irrespective of the construction of the facility. Thus, despite construction of the facility, the plaintiffs still have a concrete interest in this case and there is meaningful relief available—if successful in this appeal, they could collect enough signatures to send their referendum petition to the ballot and seek to repeal the leasing ordinance. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307–08 (2012) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." (alterations adopted) (quotation omitted)).

The City argues that the case is moot because repeal of the leasing ordinance would not change the status quo and could not invalidate the actual lease agreement because of Georgia's constitutional prohibition against the impairment of contracts, but this argument confuses the mootness inquiry with the merits. The plaintiffs' ultimate prospects of success and the legal availability of certain types of relief are not pertinent to the mootness inquiry. *See, e.g.*, *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 295 (2023) (rejecting argument that case was moot because no legal vehicle was available to achieve the ultimate relief sought in the suit); *Chafin v. Chafin*, 568 U.S. 165, 174 (2013) (rejecting a party's argument that the case was moot because the district court allegedly lacked the authority to grant the relief requested and

explaining that the "prospects of success are . . . not pertinent to the mootness inquiry").

Accordingly, we conclude that the case is not moot for purposes of Article III.[6] We now turn to whether the plaintiffs have established Article III standing.

## B.  Standing

We have an independent obligation to ensure that we have jurisdiction by determining whether the parties have Article III standing.  *See Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (*en banc*); *see also United States v. Hays*, 515 U.S. 737, 742 (1995) ("The question of standing is not subject to waiver, [and w]e are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us."

---

[6] Alternatively, the City argues that, even if the case is not moot in the constitutional sense, we should invoke the prudential mootness doctrine. Prudential mootness is a discretionary equitable doctrine that is not concerned with our Article III powers, and, therefore, is not jurisdictional. *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991) (explaining that the prudential mootness doctrine "is concerned, not with the court's power under Article III to provide relief, but with the court's discretion in exercising that power").  Under this rarely invoked doctrine, we may exercise our discretion and decline to grant relief in the context of a controversy that has become "so attenuated that considerations of prudence and comity . . . counsel the court to stay its hand, and to withhold relief it has the power to grant." *Chamber of Com. v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980).  We decline to invoke this doctrine here because, as explained above, there is a legitimate possibility of meaningful relief in this case and there is no reason to stay our hand.

(quotations omitted)).  Here, we requested that the parties brief standing, and it was extensively discussed at oral argument.

As discussed previously, Article III of the Constitution limits our jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  The standing doctrine is an essential part of this case-or-controversy requirement.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) [she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1355 (11th Cir. 2023); *see also Lewis*, 944 F.3d at 1296 (same).  "Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting." *Lewis*, 944 F.3d at 1296; *see also Hays*, 515 U.S. at 742 (explaining that "standing is perhaps the most important of the jurisdictional doctrines" and federal courts "are required to address [standing] even if the court[] below [has] not passed on it, and even if the parties fail to raise the issue . . . . (alterations adopted) (quotations omitted)).

"The burden is on the party seeking to exercise jurisdiction to allege and then to prove facts sufficient to support jurisdiction." *Pittman v. Cole*, 267 F.3d 1269, 1282 (11th Cir. 2001) (quotations

omitted).  When, as here, we are at the early stages of litigation where a preliminary injunction is being sought and the issue of standing was not raised in the district court, we apply the same standard as when standing is raised on a motion to dismiss, focusing on the sufficiency of the allegations in the complaint.[7]  *See Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994); *Bischoff v. Osceola County*, 222 F.3d 874, 882 n.8 (11th Cir. 2000) (discussing *City of Huntsville*'s standard for demonstrating standing at the preliminary injunction stage of litigation).  Under this standard, "general factual allegations of injury" can suffice, and "[w]e accept as true all material allegations contained in the complaint and construe the complaint in a light most favorable to the complaining party."  *Elend v. Basham*, 471 F.3d 1199, 1208 (11th Cir. 2006).  Furthermore, in evaluating whether the plaintiffs have established Article III standing, "we must assume that on the merits [the plaintiffs] would be successful" on their claim.  *See Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 922 (11th Cir. 2023); *Culverhouse v. Paulson & Co. Inc.*, 813 F.3d 991, 994 (11th Cir. 2016); *see also Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022) ("For standing purposes, we accept as valid the merits of appellees' legal

---

[7] We note, however, that in cases where standing is contested in the district court, we have not decided what degree of evidence is necessary to establish standing at the preliminary injunction stage.  *See Church v. City of Huntsville*, 30 F.3d 1332, 1336 n.1 (11th Cir. 1994) ("We leave for another day a determination of the degree of evidence necessary to support standing at the preliminary injunction stage when the plaintiff is on notice that standing is contested.").

claims, so we must assume that the loan-repayment limitation . . . unconstitutionally burdens speech.").

### i.    Injury in Fact

Baker, Dougherty, Jones, and Weltner allege that they have suffered a First Amendment injury because § 66-37(b)'s residency requirement for signature gatherers "markedly reduces the pool of people who can circulate petitions" and "bars [them] from collecting signatures on their own, and thereby deprives [them] of the opportunity to collect signatures on a matter on which they are politically engaged and that directly affects them."  In other words, they allege their speech is chilled by the residency requirement for signature gatherers.  While we express no opinion on the merits of the plaintiffs' assertion that § 66-37(b)'s residency requirement violates the First Amendment, accepting their allegations as true and assuming they would be successful on the merits as we must at this preliminary stage of the proceedings, we conclude that their allegations are sufficient to establish an injury in fact for purposes of Article III standing.  *See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 311, 315 (4th Cir. 2013) (concluding that the Libertarian Party of Virginia's allegations that the requirement that a resident of the state witness signatures on nominating petitions limited the number of petition circulators and the size of the audience it could reach "constitute[d] an injury in fact for standing purposes"); *Krislov v. Rednour*, 226 F.3d 851, 856–57 (7th Cir. 2000) (holding that political candidates had standing to challenge Illinois's requirement that nominating petition circulators be registered resident "voters

of the same political subdivision for which the candidate is seeking office" because the requirement allegedly deprived the candidates of the political advocates of their choice and limited the number of people who could carry their message, which "can be an injury to First Amendment rights"); *Lerman v. Bd. of Elections in the City of N.Y.*, 232 F.3d 135, 139, 142–43 (2d Cir. 2000) (concluding that plaintiff had sufficiently alleged an injury in fact when she claimed that New York's requirement that petition signatures be witnessed by a person who was a "resident of the political subdivision in which the office or position [was] to be voted for" deprived the plaintiff of her First Amendment right to "gather signatures [o]n behalf of" the candidate of her choice).

ii.       Traceability

The second question we must consider in determining whether the plaintiffs have standing is whether the asserted "injury is fairly traceable to the challenged action of the defendant." *Lowman*, 83 F.4th at 1355. The traceability requirement is also sometimes referred to as a "causation" requirement—meaning the plaintiffs must demonstrate "a fairly . . . traceable connection between the alleged injury in fact and the alleged conduct of the defendant." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (alterations adopted) (quotations omitted). We have repeatedly emphasized that "the traceability requirement is less stringent than proximate cause: '[e]ven a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement.'" *Cordoba v. DIRECTV,*

*LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019) (quoting *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012)).

The plaintiffs here easily satisfy the traceability requirement. Their alleged injuries are the direct result of the City's enforcement of § 66-37(b). In fact, the initial referendum petition submitted to the municipal clerk was rejected as to form by the clerk because the draft provided "[did] not comply with the legal requirement that the petition contain a place on each form for the person collecting signatures to provide his or her name, street address, city, county, state, ZIP code, and telephone number and to swear that he or she is a resident of the City of Atlanta." By enforcing the requirement that the referendum petition include a space "for the person collecting signatures . . . to swear that he or she is a resident of the City of Atlanta," the City foreclosed the ability of the plaintiffs who are nonresidents to collect signatures. Accordingly, the plaintiffs have satisfied the traceability requirement for purposes of Article III.

### iii.        Redressability

The final requirement of Article III standing is that the plaintiffs demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lowman*, 83 F.4th at 1355. In other words, the plaintiffs need to demonstrate that "a court decision can . . . eliminate the harm." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (*en banc*); *see also Lewis*, 944 F.3d at 1301 (*en banc*) (explaining that the redressability inquiry "ask[s] whether a

decision in a plaintiff's favor would significant[ly] increase . . . the likelihood that [the plaintiff] would obtain relief that directly redresses the injury that she claims to have suffered" (second alteration in original) (quotations omitted)).

Here, the plaintiffs satisfy redressability because they requested that the district court enjoin enforcement of the residency requirement in local ordinance § 66-37(b) and the identical requirement in Georgia's Home Rule Act for Municipalities, O.C.G.A. § 36-35-3(b)(2)(C), from which ordinance § 66-37(b) flows.   Enjoining enforcement of the residency requirement would remedy their alleged harm—their inability to collect signatures for referendum petitions as non-residents of the City.   Thus, at this preliminary stage of the proceedings, the plaintiffs have included sufficient allegations and requests for relief that satisfy the redressability element of Article III standing.

The City argues that the plaintiffs cannot show redressability because the preliminary injunction the district court issued enjoining the residency requirement in municipal ordinance § 66-37(b) was silent as to the residency requirement in O.C.G.A. § 36-35-3(b)(2)(C), and the City is still required to follow O.C.G.A. § 36-35-3.   In other words, according to the City, the preliminary injunction that issued does not eliminate the plaintiffs' harm because under § 36-35-3(b)(2)(C) non-residents of the city are still prohibited from collecting signatures for referendum petitions. We disagree.   The City's argument confuses the question of redressability with the remedy actually granted.   Properly framed,

the appropriate question is whether the district court could have redressed the plaintiffs' injury.  Here, the district court could have redressed the alleged injury by enjoining both the municipal ordinance in § 66-37(b) and O.C.G.A. § 36-35-3.  The fact that the district court did not enjoin O.C.G.A. § 36-35-3 does not affect whether the plaintiffs have shown redressability.  Accordingly, we conclude that the plaintiffs have satisfied the redressability requirement for purposes of Article III.

Having concluded that the plaintiffs have standing, we now turn to the merits of the arguments concerning the preliminary injunction.

### C.  Preliminary Injunction

The City maintains that the district court abused its discretion for a variety of reasons in granting the plaintiffs' request for a preliminary injunction.[8]  We focus our analysis on whether the plaintiffs established irreparable harm.

As noted previously, a district court may grant a preliminary injunction only if the moving party establishes, among other factors, that "it has a substantial likelihood of success on the merits" and that "it will suffer an irreparable injury unless the injunction is granted."  *Gonzalez*, 978 F.3d at 1271; *see also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*) ("[A] preliminary

---

[8] "We review the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *Gonzalez*, 978 F.3d at 1270.

injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the . . . prerequisites." (quotations omitted)).    The substantial likelihood of success on the merits requirement is generally the most important factor.  *Gonzalez*, 978 F.3d at 1271 n.12.    Nevertheless, "even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."    *Siegel*, 234 F.3d at 1176; *see id.* ("A showing of irreparable injury is the sine qua non of injunctive relief." (quotations omitted)).

Here, the City maintains that even if we assume arguendo that the plaintiffs showed a substantial likelihood of success on the merits, injunctive relief is not appropriate because under the Supreme Court of Georgia's *Kemp* decision, the plaintiffs cannot use the referendum process to repeal a local ordinance and thus the plaintiffs cannot show irreparable harm.[9]    We agree.

---

[9] The district court declined to reach the City's argument that the plaintiffs could not show irreparable harm because the referendum petition itself was invalid under *Kemp*, concluding that the validity of the petition was not ripe for review.  Instead, the district court explained that, in its view, the only issue before the court was "whether Atlanta Municipal Code § 66-37(b) violates the First Amendment by requiring signature gatherers to be City residents." However, in order to determine whether § 66-37(b)'s residency requirement irreparably harms the plaintiffs' First Amendment rights, the court must first determine whether the referendum process is an available process in the first instance.  If the referendum process is not an available means to challenge the leasing ordinance for the new training facility, then there necessarily cannot

23-12469                 Opinion of the Court                 25

In *Kemp*, the Supreme Court of Georgia held that the petition procedure in subsection O.C.G.A. § 36-35-3(b)(2)—from which Atlanta's virtually identical local ordinance § 66-37(b) flows—"applies only to amendments to municipal charters." 496 S.E.2d at 716. In reaching this conclusion, the court reasoned as follows:

> The cardinal rule of statutory interpretation is to ascertain the legislative intent, "keeping in view at all times the old law, the evil, and the remedy." OCGA § 1–3–1(a); *Miller v. Georgia Ports Auth.*, 266 Ga. 586, 587(1), 470 S.E.2d 426 (1996). A primary purpose of the Municipal Home Rule Act was to authorize municipalities to amend their charters by their own actions. *Sadler v. Nijem*, 251 Ga. 375, 376, 306 S.E.2d 257 (1983). The Act was passed under the authority of a 1954 amendment to the Constitution of the State of Georgia, which is currently found at Art. IX, Sec. II, Par. II. Prior to the 1954 amendment and the Home Rule Act of 1965, city charters were amendable only by acts of the General Assembly. *See Sadler, supra*; *Phillips v. City of Atlanta*, 210 Ga. 72, 77 S.E.2d 723 (1953). The two procedures of OCGA § 36–35–3(b) were enacted to relieve the General Assembly of its earlier burden of separately amending each and every city charter in the state.

---

be any irreparable injury. In other words, the answer to the irreparable harm question is inextricably intertwined with, and dependent upon, the answer to the *Kemp*-based question.

Moreover, a statute is to be read as a whole, and the spirit and intent of the legislation prevails over a literal reading of the language. *Hargrove v. State*, 253 Ga. 450, 452(1), 321 S.E.2d 104 (1984); *Sirmans v. Sirmans*, 222 Ga. 202, 204, 149 S.E.2d 101 (1966). The legislative intent will be effectuated even if some language must be eliminated. *Maples v. City of Varnell*, 244 Ga. 163, 164, 259 S.E.2d 94 (1979). The language upon which the [the plaintiffs rely] is the reference to "amendments to or repeals of ordinances, resolutions, or regulations," found in OCGA § 36-35-3(b)(2)(A). All of OCGA § 36–35–3(b) is prefaced by a statement that what follows are the methods by which a municipal corporation may "amend its charter." This also shows that the petition and referendum provision is intended to be available only when the proposed amendment is intended to affect a city charter.

Further, when examined in the context of the structure of OCGA § 36–35–3, the very concept of home rule suggests that the provisions of (b)(2) apply only to charter amendments. Municipal corporations are creations of the state, possessing only those powers that have been granted to them, and allocations of power from the state are strictly construed. *Porter v. City of Atlanta*, 259 Ga. 526, 384 S.E.2d 631 (1989). Municipal home rule power is a delegation of the General Assembly's legislative power to the municipalities. Ga. Const. of 1983, Art. IX, Sec. II, Par. II; *Cooper v. City of Gainesville*, 248 Ga.

269, 270, 282 S.E.2d 322 (1981); *Plantation Pipe Line Co. v. City of Bremen*, 227 Ga. 1, 6(1), 178 S.E.2d 868 (1970). OCGA § 36–35–3(a) specifies that the delegation of legislative power is to "[t]he governing authority," which is the Mayor and Council. *See Savage v. City of Atlanta*, 242 Ga. 671, 674–675(1), 251 S.E.2d 268 (1978). Under an interpretation of OCGA § 36–35–3(b)(2) that would allow the electorate to petition for a referendum on all ordinances and resolutions, the electorate would be exercising legislative power. As we must strictly construe the grant of legislative power to the governing authority, we must reject plaintiffs' argument that the electorate can directly exercise such general legislative power.

*Kemp*, 496 S.E.2d at 715–16.

Although the plaintiffs correctly point out that the reasoning of *Kemp* has been called into question by the Supreme Court of Georgia's recent decision in *Camden County v. Sweatt*, 883 S.E.2d 827 (Ga. 2023),[10] the fact remains that *Kemp* is still controlling

---

[10] In *Sweatt*, the Supreme Court of Georgia considered whether Article 9, Section 2 of the Georgia Constitution, which is the "Home Rule for counties" provision, authorized a referendum to overturn county resolutions. 883 S.E.2d at 835–36. Similar to the Home Rule for municipalities, the Home Rule for counties states that:

(a) The governing authority of each county shall have legislative power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government for which no provision has been made by general law and which is not inconsistent with

28                    Opinion of the Court                    23-12469

precedent in Georgia, and we are bound by *Kemp* unless and until it is overruled.  *See Gonzalez*, 978 F.3d at 1271 (explaining that we are "bound by the decisions of the Supreme Court of Georgia on questions of Georgia law"); *Johnson v. 3M Co.*, 55 F.4th 1304, 1312

---

> this Constitution or any local law applicable thereto.  Any such local law shall remain in force and effect until amended or repealed as provided in subparagraph (b). . . .
>
> (b) Except as provided in subparagraph (c), a county may, as an incident of its home rule power, amend or repeal the local acts applicable to its governing authority by following either of the procedures hereinafter set forth:
>
> > (1) Such local acts may be amended or repealed by a resolution or ordinance duly adopted at two regular consecutive meetings of the county governing authority not less than seven nor more than 60 days apart. . . .
> >
> > (2) Amendments to or repeals of *such local acts or ordinances, resolutions, or regulations* adopted pursuant to subparagraph (a) hereof may be initiated by a petition filed with the judge of the probate court of the county. . . .

Ga. Const., art. 9, § II, ¶ I(b) (emphasis added).  Based on the plain text of the constitutional provision, the *Sweatt* court held that "the Home Rule Paragraph authorized the County's electorate to petition for the repeal of the Resolutions."  *Sweatt*, 883 S.E.2d at 838.  The court recognized that its holding created "tension with *Kemp*," but concluded that *Kemp* was not controlling because it involved "a completely separate legal provision."  *Id*.  Thus, the court concluded that it "need not consider at this time whether *Kemp* should be overruled," although it disapprovingly noted that the *Kemp* court disregarded many of the traditional canons of statutory construction in reaching its decision.  *Id*.

23-12469              Opinion of the Court                    29

(11th Cir. 2022) (stating that "[t]he Georgia Supreme Court's latest word . . . controls us when it comes to Georgia law").

As applied to the present case, *Kemp* forecloses the use of a referendum petition under O.C.G.A. § 36-35-3(b)(2)—and by necessary extension Atlanta's local ordinance § 66-37(b)—to repeal the leasing ordinance, because that ordinance does not affect the City's charter.[11]   In other words, the plaintiffs and the coalition

---

[11] Alternatively, the plaintiffs argue that, notwithstanding *Kemp*, § 2-501 of the City charter independently authorizes the referendum process.  We disagree. Section 2-501 of the City charter, entitled "initiative and referendum," provides as follows:

> (a) The council shall by ordinance prescribe procedures to govern the initiation, adoption, and repeal of ordinances by the electorate, and the council shall authorize an initiative or referendum election on petition of at least 15 percent of the registered voters qualified to vote in the preceding general municipal election.

> (b) The council shall be authorized to submit to the qualified voters of the city at any election not called only for the purpose of putting said ordinance or resolution before the voters any ordinance or resolution which it may deem proper; and in the event a majority of voters shall vote for this ordinance or resolution, it shall be adopted.  If a majority of the votes so cast are against the resolution or ordinance, it shall be defeated and shall not thereafter be adopted by the council until resubmitted to and adopted by the qualified voters of the city.  If it receives a majority vote of the people and becomes effective, then it can only be repealed by a majority vote of the qualified voters voting at an election for such purpose.

sponsoring the petition cannot use the referendum process to repeal a local ordinance.[12]  *Kemp*, 496 S.E.2d at 716.  And because no petition for referendum can lie to repeal a local ordinance, the plaintiffs necessarily will not suffer any irreparable harm from being denied the right to gather petitions for a referendum process that is unavailable to them as a matter of state law.  In sum, contrary to the dissent's position, because Georgia never granted the plaintiffs a referendum or repeal process for city ordinances in the first place, they cannot be irreparably harmed from being denied the ability to participate in an unavailable process.  Thus, they cannot satisfy the irreparable injury requirement for obtaining an injunction.

---

Atlanta City Charter § 2-501.  Under well-established principles of local government law, this section merely authorizes the City to adopt procedures for petitions and referendum, pursuant to constraints of general state laws, including O.C.G.A. § 36-35-3(b)(2).  It does not give the City the independent power to authorize referendum processes beyond those authorized under O.C.G.A. § 36-35-3.  *See Kemp*, 496 S.E.2d at 715 ("[M]unicipal corporations are creations of the state, possessing only those powers that have been granted to them, and allocations of power from the state are strictly construed."); *City of Doraville*, 181 S.E.2d at 350 ("A municipality, being a creature of the State has only such direct power as is granted to it by the State and if there is a reasonable doubt of the existence of a particular power, the doubt is to be resolved in the negative."); *Ivey v. McCorkle*, 806 S.E.2d 231, 233 (Ga. Ct. App. 2017) ("An ordinance enacted in violation of OCGA § 36-35-3[] is void.").

[12] Because we conclude that a petition for referendum to repeal a local ordinance cannot lie under *Kemp*, we do not reach the City's alternative argument that the referendum is invalid because it seeks to impair a contract.

Because the district court erred in concluding that the plaintiffs met the requirement of showing irreparable injury, we need not address the other injunctive factors. Accordingly, for the above reasons, we conclude that the district court abused its discretion in granting the plaintiffs' request for preliminary injunction.[13]

### III.    Conclusion

In light of the above, we conclude that the plaintiffs have Article III standing and the case is not moot. However, because

---

[13] We note that the City made a number of other arguments on appeal, including (1) that the district court violated *Purcell v. Gonzlaez*, 549 U.S. 1 (2006), when issuing the injunction; (2) that the plaintiffs did not show a substantial likelihood of success on the merits; (3) that the referendum seeks to impair a contract; (4) that the third and fourth injunctive factors did not support the request for injunctive relief; and (5) that the district court erred in severing the contested residency requirement from the remainder of § 66-37(b). Because we conclude that the plaintiffs failed to satisfy the irreparable injury requirement, it is unnecessary for us to address these arguments.

With regard to the City's argument that the district court erred in the scope of the remedy by restarting the 60-day signature collection period for everyone, including residents of the City whose alleged First Amendment rights were not burdened, we note that "[t]he Supreme Court has cautioned that remedies should be limited to the inadequacy that produced the injury in fact that the plaintiff has established, and no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (quotations omitted). Nevertheless, we also do not reach this issue because we conclude irreparable harm is not met and the injunction was improper in the first instance.

the plaintiffs failed to show an irreparable injury, the district court abused its discretion in granting the preliminary injunction. Accordingly, we vacate the injunction and remand the case to the district court for further proceedings.

**VACATED AND REMANDED.**

23-12469                    NEWSOM, J., Dissenting                    1

NEWSOM, Circuit Judge, dissenting:

Bracketing the question whether the plaintiffs have shown a substantial likelihood of success on the merits of their First Amendment claim, the Court vacates the district court's preliminary injunction on the ground that they haven't demonstrated "irreparable injury." Respectfully, I disagree.

To be clear, the Court doesn't dispute the established (and recently reaffirmed) principle that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam)). Instead, the Court seems to say that the plaintiffs' "First Amendment freedoms" never really materialized here because (1) under the Georgia Supreme Court's decision in *Kemp v. City of Claxton*, 496 S.E.2d 712 (Ga. 1998), Section 66-37(b)'s "referendum process" applies only to municipal-charter amendments, and (2) the plaintiffs aren't seeking to amend Atlanta's city charter, and thus can't avail themselves of that "referendum process." Maj. Op. at 24–29.

I don't think that's quite right. The "referendum process" to which the Court refers comprises two discrete steps. At step one, petitioners like the plaintiffs fan out into the community to advocate their position and attempt to collect signatures in support of their cause—here, the effort to force a vote to repeal the local ordinance that authorized Cop City's lease. At step two, the petitioners submit their signed petition to the city for approval.

2                    NEWSOM, J., Dissenting                 23-12469

The *Kemp* problem that the Court identifies pertains to the second of the two steps:  Chances are the city will reject the petitioners' signed petition because, as a matter of existing state law, Section 66-37(b) doesn't cover grass-roots efforts to make non-charter-related amendments to municipal ordinances.

But however remote the possibility that city officials will ultimately approve their petition, it seems to me that the plaintiffs have a separate, stand-alone First Amendment interest in participating in the signature-gathering process itself—in going through the motions, so to speak.  Indeed, the Supreme Court has expressly distinguished between speech- and petition-related acts, on the one hand, and the success of those acts, on the other.  In *Smith v. Arkansas State Highway Employees, Local 1315*, for instance, the Court reaffirmed that "[t]he First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances"—despite the fact that it does *not* separately "impose any affirmative obligation on the government to listen [or] respond."  441 U.S. 463, 464–65 (1979) (per curiam); *accord Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) (same).

With respect to the particular type of speech act at issue here—the circulation of a citizen-initiated petition that seeks to place an issue on a general-election ballot—the Supreme Court's unanimous decision in *Meyer v. Grant*, 486 U.S. 414 (1988), is effectively on point.  There, the Court detailed precisely why,

whatever a petition's ultimate fate, the very process of circulating it involves "core political speech":

> The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

*Id*. at 421–22.

The only potential hitch, it seems to me, is that in light of *Kemp*, the plaintiffs' petition-circulation efforts here may well be doomed to fail: In all likelihood, despite the plaintiffs' best canvassing efforts, city officials will reject their petition on *Kemp* grounds. Two rejoinders: First, given the Georgia Supreme Court's recent (and pointed) criticism of *Kemp* for privileging "spirit and intent" to plain text in statutory interpretation, *see Camden County v. Sweatt*, 883 S.E.2d 827, 839 (Ga. 2023), the plaintiffs could

appeal the city's denial up through the state-court system—and, who knows, perhaps eventually prevail.

Second, even if the plaintiffs' campaign *is* a fool's errand, it's a fool's errand to which the First Amendment entitles them.  Even if their petition is ultimately rejected on *Kemp* grounds, that is, the plaintiffs may well think:  *The effort was worth it—we made our voices heard, we got our message out, we planted the seed.*  That, it seems to me, is wheelhouse First Amendment stuff.  *See, e.g., Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.").

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 09, 2026

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-12469-HH
Case Style:  Lisa Baker v. City of Atlanta, et al
District Court Docket No:  1:23-cv-02999-MHC

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion