IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| LISA BAKER, | ) | |
| JACQUELINE DOUGHERTY, | ) | |
| KEYANNA JONES MOORE, | ) | |
| AMELIA WELTNER | ) | Case no.: |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 1:23-cv-2999-MHC |
| v. | ) | |
| | ) | |
| CITY OF ATLANTA, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

## PARTIES

1.    Plaintiffs Lisa Baker, Jacqueline Dougherty, Keyanna Jones Moore, and Amelia Weltner were, at the time of filing, residents of unincorporated DeKalb County, Georgia.

2.    The City of Atlanta is a municipal corporation located in Georgia. Its City Council is tasked with determining the validity of the referendum petition.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case presents a federal question.

4.    Upon service of process, this Court acquired personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(a).

5.     Venue is proper in the Atlanta Division of the Northern District of Georgia under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### *The Political Moment*

6.     On June 7, 2023, a coalition of individuals and organizations ("Cop City Vote") filed a referendum petition with the Municipal Clerk of the City of Atlanta seeking to repeal City of Atlanta Ordinance 21-O-0367.

7.     Ordinance 21-O-0367 authorized the lease of 265 acres of City property in unincorporated DeKalb County to the Atlanta Police Foundation for the purpose of building a $90 million public safety training center (hereinafter "Training Center").

8.     On June 21, 2023, the Municipal Clerk approved and delivered official copies of the referendum petition to Cop City Vote. The petition language required circulators of the petition to attest that they were residents of the City of Atlanta.

9.     After approving the referendum petitions, the 60-day period to collect signatures began pursuant to O.C.G.A. § 36-35-3(b)(2)(C).

10.    Plaintiffs are individuals who resided in unincorporated DeKalb County and who wanted to participate in signature collection, both individually and in conjunction with others who may or may not have been City of Atlanta residents but were not permitted to do so because the referendum petitions required them to certify that they were residents of the City of Atlanta.

11.    The collection of signatures in support of a referendum petition is core political speech under the First Amendment of the United States Constitution.

12.    Plaintiffs initially filed suit on July 6, 2023. *See* Doc. 1. Plaintiffs then moved for a preliminary injunction, which this Court granted on July 27, 2023, based on its finding that the residency restriction likely violated the First Amendment of the United States Constitution. *See* Doc. 26.

13.    The preliminary injunction required the City of Atlanta to issue referendum petition forms that did not include the residency attestation. *See* Doc. 26 at 30.

14.    This had the effect of enabling Plaintiffs to individually collect signatures in support of the referendum and to sign the attestation of the signature collector.

15.    On January 9, 2026, the Eleventh Circuit vacated the preliminary injunction entered by this Court. *See* Doc. 46.

*The Plaintiffs*

16.    Plaintiff Lisa Baker is a nurse who lived around four miles from the site of the Training Facility but is not a City of Atlanta resident.

17.    Ms. Baker has been organizing and involved in environmental justice movements in the Atlanta area since 2007, when she began a local chapter of Step It Up (now known as "350.org").

18.    She has been active in her opposition to the City Council's proposed Training Center since before 2021.

19.     She was involved in the Cop City Vote coalition and wanted to be part of its volunteer corps that obtains signatures supporting the referendum.

20.     Plaintiff Jacqueline Dougherty was an early childhood education instructor who was pursuing a master's in art and education at Georgia State University. Ms. Dougherty lived less than two miles from the future site of the Training Center but was not a City of Atlanta resident.  She was actively involved in issues concerning the land and watershed in and around Intrenchment Creek for eight years, which flows through the land where the Training Center was built.

21.     Ms. Dougherty enjoyed the forest and nearby parks recreationally. She accompanied hydrologists studying the watershed. And in 2016 she participated in mapping its headwaters with the South River Watershed Alliance.

22.     She participated in canvassing for political candidates in recent elections and was prepared to canvass once the Cop City Vote coalition filed its referendum petition.

23.     However, because of the residency restrictions of Atlanta Municipal Code § 66-37(b), Ms. Dougherty could not collect signatures herself, despite the negative impacts the Training Facility would have on her use and enjoyment of the land near her home.

24.     Keyanna Jones Moore and her family grew up in the neighborhood abutting the Training Center site, but she is not a City of Atlanta resident.

25.    In January 2022, she moved back to the neighborhood with her husband and children. In May 2023, she and her family decided they needed to move out of her neighborhood because of the effect the sounds of gunfire from the nearby police firing range on her son's well-being.

26.    Ms. Jones Moore has worked for years as a community organizer and worked on other campaigns opposing the harmful effects of carceral facilities in and around Atlanta.

27.    Ms. Jones Moore actively participated in the Cop City Vote coalition. Although, she desired to circulate a referendum petition, she could not do so because she is not a City of Atlanta resident.

28.    Amelia Weltner lives in unincorporated DeKalb County in the East Atlanta Village neighborhood on the border with the City of Atlanta but is not a current City of Atlanta resident. She moved to the neighborhood after living in Old Fourth Ward in the City of Atlanta.

29.    Ms. Weltner's home is less than three miles from the site of the Training Facility.

30.    Ms. Weltner is an active member of the East Atlanta Community Association, and in December 2022, she planned a canvass of neighborhoods in East Atlanta, collecting signatures for a petition to demonstrate public opposition to the Training Facility in the East Atlanta Village.

31.    Ms. Weltner desired to circulate a referendum petition but could not do so under Atlanta Municipal Code § 66-37(b) because – although living only feet away from the border of the City of Atlanta - she is not a City of Atlanta resident.

*The Residency Restrictions in Georgia Law
and City of Atlanta's Municipal Code*

32.    The Georgia Constitution authorizes the Legislature to establish the laws by which a municipality may exercise home rule. Ga. Const. art. IX, § 2, ¶ II.

33.    The Georgia Legislature then created a process by which citizens could petition for a referendum to "amen[d] or repeal[] ordinances, resolutions, or regulations" adopted by cities under the cities' home rule powers. O.C.G.A. § 36-35-3(b)(2)(A).

34.    Within that same statute, the Legislature specifies who may collect signatures for a referendum. O.C.G.A. § 36-35-3(b)(2)(C) requires:

> The clerk of the governing authority shall provide a place on each form for the person collecting signatures . . . to swear that he or she is a resident of the municipality affected by the petition and that the signatures were collected inside the boundaries of the affected municipality.

35.     The City of Atlanta's charter authorizes its City Council to "prescribe procedures to govern the initiation, adoption, and repeal of ordinances by the electorate." City of Atlanta Charter § 2-501(a).

36.    The City Council created a procedure that mirrors the residency restriction in Georgia's home rule law through Atlanta Municipal Code § 66-37(b) without

ensuring that the First Amendment rights of petition circulators are protected regardless of residency. The text of that subsection states:

> The sponsor of a petition authorized by this section shall obtain copies of all official petitions from the municipal clerk. The municipal clerk shall approve all petitions as to form. The municipal clerk shall provide a place on each form for the person collecting signatures to provide such person's name, street address, city, county, state, ZIP code and telephone number and to swear that such person is a resident of the city and that the signatures were collected inside the boundaries of the city. The collection of signatures for the petition shall begin on the day the municipal clerk provides official copies to the sponsor of the petition. A petition authorized by this section shall not be accepted by the council for verification if more than 60 days have elapsed since the date the sponsor of the petition first obtained copies of the petition from the municipal clerk.

*See* Exhibit 1 which is a true and accurate copy of Atlanta Municipal Code § 66-37.

### *The Effect of the Residency Restriction on Plaintiffs' Speech*

37.    Plaintiff Baker's experience provides a clear picture of how the referendum impacted core political speech.

38.    On June 21, 2023, Ms. Baker was among the first to volunteer to canvass signatures for the referendum petition.

39.    Because the residency restriction requires each team of canvassers to have a current City of Atlanta resident, not every volunteer was able to go out.

40. She also wanted to volunteer for a second shift that day but did not have a City of Atlanta resident to accompany her, so she could not go out.

41. Consequently, before she could go out and collect signatures, Ms. Baker would need to plan and recruit City of Atlanta residents to go with her.

42. If the first person she contacted could not go, she would continue dialing people until she found someone to accompany her.

43. This process required a lot of time and still did not guarantee that she would ultimately get to canvass. On several occasions she would call through her list of friends and other volunteers and still could not find a City resident able to accompany her.

44. Even when she was able to find someone to canvas, how long Ms. Baker could canvass was restricted by her chaperone's availability. If the City resident with whom she collected signatures left, she also had to stop collecting signatures.

45. The restriction on non-residents also restricted the number of people with whom Ms. Baker and her chaperone could communicate while canvassing.

46. Normally Ms. Baker's City resident partner would hold the clipboard with a copy of the referendum as they talked with people about signing onto the petition.

47. Because the City resident was required to witness signatures and the resident's name was on the petition, they usually talked with everyone together.

48.    The witness requirement made it difficult for the City resident to witness one person's signature while talking with someone else about signing the petition.

49.    The City resident's name also appeared on the petition, which confused people if they were talking with Ms. Baker whose name did not appear on the petition.

50.    Overall, this meant that Ms. Baker and her City resident chaperone talked with fewer people.

51.    No City of Atlanta resident had these same issues unless they chose to canvass with non-residents.

52.    City residents could collect and witness signatures by themselves.

53.    City residents did not require chaperones, and were never required to plan, ask, or cajole others to accompany them canvassing. City residents could be spontaneous and canvass whenever and however long they wished.

54.    Once the City's restriction on non-residents was enjoined, Ms. Baker could and did canvass like a City resident whenever she wished.

55.    The next day, Ms. Baker enlisted to become a professional canvasser with Field Works.

56.    She was hired, trained, and sent out to canvass in public spaces and door-to-door without a chaperone.

57.    She carried petitions in her car and collected signatures at nearly every opportunity.

58. Outside of work, she controlled and could adapt canvassing to her own schedule.

59. Plaintiff Dougherty wanted to collect signatures for the referendum petition but did not canvass before the preliminary injunction issued. The requirement that she coordinate with and secure a City of Atlanta resident before going out made it impossible to fit canvassing into her schedule.

60. Plaintiff Keyanna Jones Moore faced similar hurdles.

61. When the referendum began, Ms. Jones Moore worked for a neighborhood organizing nonprofit in Southwest Atlanta.

62. She was part of the organization's canvassing efforts in the surrounding neighborhoods.

63. She and the other canvassers were supposed to go door-to-door for three hours a day, three days a week.

64. During the first two weeks, she was unable to canvass four to five days because there were not enough City of Atlanta residents in the organization to accompany her.

65. Once there were enough city residents in her group, she was able to go door knocking, if paired with a resident to witness the signature of anyone who agreed to sign.

66.   This arrangement meant they reached fewer doors and ultimately made it harder to get the number of signatures they wanted during a shift.

67.   Ms. Jones Moore could not canvass by herself on her personal time, either, because of the residency restriction.

68.   Once the preliminary injunction lifted, she was able to door knock without being paired with a city resident. This meant she and the other canvassers could reach twice as many houses in the same amount of time.

69.   Outside of work, she was also able to go canvassing without a city resident and participated in at least four pop-up canvasses in the part of Atlanta closest to her home, East Atlanta Village.

70.   Plaintiff Weltner likewise wanted to collect signatures for the referendum petition but did not canvass before the preliminary injunction issued. The additional time and coordination required to find an available City resident made participation impractical given the demands of her daily life.

71.   The residency restriction required that a city resident personally witness and attest to every signature a non-resident volunteer collected. This requirement barred Plaintiffs Dougherty, Jones Moore, and Weltner from circulating the referendum petition on their own.

## COUNT I
*Violation of the First Amendment*
*under 42 U.S.C. § 1983*

72. Under Atlanta Municipal Code § 66-37(b) and O.C.G.A. § 36-35-3(b)(2)(C), residency in the City of Atlanta is the only criterion for limiting who may lawfully circulate petitions for referendums.

73. The circulation of petitions and petitioning the government for redress of grievances is core political speech because it involves both the expression of a desire for political change and a discussion of the merits of the proposed change.

74. The severe restriction on non-residents' speech and petition rights must be narrowly drawn to advance a compelling governmental interest.

75. Plaintiffs lived in unincorporated DeKalb County, near where the City of Atlanta has decided to build the Training Center and held views about the project that conflicted with those of the City of Atlanta decisionmakers and supporters of the project.

76. Even though their own community bore the immediate impacts of the Training Center, ecologically and otherwise, Plaintiffs' only ability to directly impact the City of Atlanta's decision-making process was through acting as circulators of this petition, but they were barred from that expressive conduct by Atlanta Municipal Code § 66-37(b) because they were not allowed to act independently in collecting signatures.

77. Plaintiffs' injury did not depend on whether the referendum petition succeeded in being placed on the ballot or in repealing City of Atlanta Ordinance 21-O-0367.

The act of circulating a petition is itself core political speech, regardless of the petition's ultimate fate.

78.    Plaintiffs therefore had a strong interest in participating and gathering signatures for a referendum to be voted upon by their City of Atlanta neighbors.

79.    Atlanta Municipal Code § 66-37(b) and O.C.G.A. § 36-35-3(b)(2)(C), barred Plaintiffs from gathering petition signatures independently because they were not City residents.

80.    Atlanta Municipal Code § 66-37(b) and O.C.G.A. § 35-35-3(b)(2)(C) are not narrowly tailored to serve a compelling interest. In fact, they barred those such as Plaintiffs who had a greater interest in the project from acting to express their views on the project, from participating in the petition process.

81.    As a direct and proximate result of the residency restriction, Plaintiff Baker was repeatedly and severely curtailed in her ability to circulate the referendum petition: she was unable to canvass at all on multiple occasions when no City resident was available to accompany her, she was limited in the number of people she could speak with even when a chaperone was available, and her exclusion from circulating independently ended only once this Court's preliminary injunction issued.

82.    Plaintiffs Baker, Dougherty, Jones Moore, and Weltner each wanted to circulate the referendum petition and were barred from doing so.

83.     Plaintiffs Baker and Jones Moore are entitled to nominal, presumed, and actual damages for the deprivation of their First Amendment rights.

84.     Plaintiffs Dougherty and Weltner are each entitled to nominal damages for the deprivation of their First Amendment rights.

85.     Plaintiffs are entitled to a declaration that Atlanta Municipal Code § 66-37(b) and O.C.G.A. § 36-35-3(b)(2)(C), violates the First Amendment on its face and as applied to Plaintiffs.

### *Request for Relief*

Plaintiffs request this Court:

    a. Hold a trial by jury on all issues so triable;

    b. Declare the residency requirement in Atlanta Municipal Code § 66-37(b) and O.C.G.A. § 36-35-3(b)(2)(C), violates the First Amendment on its face and as applied;

    c. Award Plaintiffs' attorney's fees under 42 U.S.C. § 1988;

    d. Award Plaintiffs actual, presumed, and nominal damages;

    e. Grant any relief to which Plaintiffs are entitled as a matter of law or equity.

Submitted on July 29, 2026.

FILIPOVITS & SMITH, LLC
315 W. Ponce de Leon Ave., Ste. 865    **Jeff Filipovits**
Decatur, Georgia 30030    Georgia Bar No. 825553

404-905-2225
jeff@civil-rights.law
wingo@civil-rights.law

**Wingo F. Smith**
Georgia Bar No. 147896

**Gerald Weber**
Georgia Bar No. 744878

Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, Georgia 31107
404-522-0507
wgerryweber@gmail.com